**ORIGINAL**

Approved:

**B. R. Y**
_____
BRIAN YOUNG
ALEXANDER H. BERLIN
Trial Attorneys
CAROL L. SIPPERLY
Senior Litigation Counsel
*Criminal Division, Fraud Section*

**Lus, Ghez**
_____
LUDOVIC C. GHESQUIERE
MICHAEL T. KOENIG
Trial Attorneys
ELIZABETH B. PREWITT
Assistant Chief, New York
*Antitrust Division*

**14 MAG 0069**

Before:   Ronald L. Ellis
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :

                                        :

          - v. -                        :     **COMPLAINT**

                                        :     18 U.S.C. §§ 1349 &
                                              1343 and 18 U.S.C.
PAUL ROBSON,                            :     § 2
PAUL THOMPSON,
TETSUYA MOTOMURA.                       :
                                              COUNTY OF OFFENSE
          Defendants.                   :     New York and
                                              elsewhere
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          JEFFREY WEEKS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Wire and Bank Fraud)

The Conspiracy

          1.   From at least in or about May 2006 through at least in or about early 2011, in the Southern District of New York and elsewhere, PAUL ROBSON, PAUL THOMPSON, and TETSUYA MOTOMURA, the defendants, together with Trader-R and others, did knowingly combine, conspire, confederate, and agree to commit certain offenses against the United States, that is:

1

      a.    to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme; to wit, the defendants engaged in a scheme to manipulate and attempt to manipulate the interest rates referenced by derivative products throughout the financial industry to their advantage, by the dissemination, and submission, of false and fraudulent statements intended to influence and manipulate the benchmark interest rates to which the profitability of interest rate derivative trades was tied, and the defendants contemplated, foresaw, and caused use of wires in interstate and foreign commerce in carrying out the scheme, in violation of Title 18, United States Code, Section 1343; and

      b.    to execute and attempt to execute a scheme and artifice to defraud a financial institution, the deposits for which were at the time insured by the Federal Deposit Insurance Corporation; and to obtain and attempt to obtain moneys, funds, credits, assets, and other properties owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises, as well as by omission of material facts in violation of Title 18, United States Code, Section 1344.

    2.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

      a.    At various times relevant to this Complaint, as set forth below, ROBSON engaged with THOMPSON, MOTOMURA and Trader-R, as well as others, in electronic chats;

      b.    At various times relevant to this Complaint, as set forth below, ROBSON made and caused to be made false and fraudulent Japanese Yen ("Yen") LIBOR submissions; and

      c.    At various times relevant to this Complaint, THOMPSON, MOTOMURA, and Trader-R traded derivative products tied to Yen LIBOR with counterparties located in New York, New York for which international wire transfer communications were transmitted in interstate and foreign commerce, including to and from New York, New York on or about the following dates: March 20, 2008; April 18, 2008; and April 24, 2008.

(Title 18, United States Code, Section 1349)

## COUNT TWO
### (Wire Fraud)

3. On or about March 20, 2008, in the Southern District of New York and elsewhere, PAUL ROBSON and TETSUYA MOTOMURA, the defendants, together with Trader-R, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the interest rates referenced by derivative products throughout the financial industry to their advantage, ROBSON and MOTOMURA caused an international wire transfer communication to be transmitted by wire from Utrecht, The Netherlands via Tokyo, Japan to New York, New York.

(Title 18, United States Code, Sections 1343 and 2)

## COUNT THREE
### (Wire Fraud)

4. On or about May 10, 2006, in the Southern District of New York and elsewhere, PAUL ROBSON and PAUL THOMPSON, the defendants, together with Trader-R, unlawfully, willfully, and knowingly, having devised and intending to devise

a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, in furtherance of the scheme to manipulate and attempt to manipulate the interest rates referenced by derivative products throughout the financial industry to their advantage, PAUL ROBSON and PAUL THOMPSON caused the submission of false and fraudulent information that was then incorporated into the calculation of the international interest rate benchmark that was published by a wire communication to be transmitted from the United Kingdom to New York, New York.

(Title 18, United States Code, Sections 1343 and 2)

### Effect on a Financial Institution

5. The scheme had an effect on one or more financial institutions, within the meaning of Title 18, United States Code, Sections 20 and 3293(2).

\* \* \* \* \*

The bases for my knowledge and the foregoing charges are, in part, as follows:

6. I am a Special Agent with the Federal Bureau of Investigation of the United States Department of Justice. I am thoroughly familiar with the information contained in this Complaint, either through my own direct involvement in investigative work or through conversations with law enforcement agents and others, and my examination of documents, audio recordings, and other records. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know about the investigation. To the extent that this Complaint contains assertions concerning dates and numbers, such assertions are often approximations based upon information and evidence gathered to date. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Relevant Background

### The London Interbank Offered Rate

During the relevant time period:

7. The London Interbank Offered Rate ("LIBOR") was a benchmark interest rate overseen by the British Bankers' Association ("BBA"), a trade association based in London, United Kingdom that represented approximately 200 banks from more than 60 countries.

8. LIBOR was calculated every London business day by averaging the interest rates at which designated banks ("contributor panel" banks) estimated that they could borrow unsecured funds from other banks across ten currencies, including the Japanese Yen. Contributor panel banks for each currency submitted their estimated borrowing rates for 15 different borrowing periods ("maturities" or "tenors"), ranging in length from overnight to one year, including maturities of one month, three months, and six months (commonly referenced as "1m," "3m," and "6m").

9. Thomson Reuters, acting as an agent for the BBA, received electronically the contributor panel banks' estimated interest rate submissions at or before approximately 11:10 a.m. in London. By approximately 12:00 p.m. in London, Thomson Reuters published the averaged rates - or LIBORs - to servers and traders of LIBOR-based financial products around the world, including to servers and traders based in New York, New York, among other places.

10. Among other currencies, Thomson Reuters received estimated interest rate submissions for the Japanese Yen ("Yen") LIBOR from sixteen designated contributor panel banks, specifically from bank employees referred to as "submitters" or "setters." Upon receipt of the sixteen contributor panel banks' Yen LIBOR submissions, Thomson Reuters: (a) ranked the submissions from highest to lowest; (b) excluded the four highest and four lowest submissions; and (c) averaged the remaining middle eight submissions to determine the official Yen LIBOR setting (also referred to as the "fix") used to settle trades and as a reference rate for various financial products. This process was repeated for each different maturity or tenor. Contributor panel banks' Yen LIBOR submissions went to between two and five decimal places, and the published Yen LIBOR fix was rounded, if necessary, to five decimal places. In the context

of measuring interest rates, one "basis point" (or "bp") was one-hundredth of one percent (0.01 percent).

11. The published LIBOR rates were used as the basis for the pricing of fixed-income futures, options, swaps, forward rate agreements, and other derivative instruments.

12. Interest rate swaps involved an agreement between counterparties to exchange payments in the future: one counterparty paid a fixed rate while the other paid a variable one. Generally, the fixed rate was agreed upon at the outset by the counterparties and the variable rate was set at some point in the future. Often times, the variable rate was based on a reference rate such as Yen LIBOR. The actual value of the contract could not be determined until the date on which the variable rate was set. At that point, payments were exchanged, and, depending on the value of the variable rate, one party made money and the other lost money.

13. Traders made predictions on where LIBORs would set in the future. Traders, on behalf of their respective financial institutions, often entered into multiple derivatives contracts containing LIBORs as a price component based on those views. Therefore, the profit and loss that flowed from those contracts was directly affected by the relevant LIBORs on certain dates. If the relevant LIBORs moved in the direction favorable to the trader's position, the financial institution and the trader benefitted at the expense of their counterparties. When the traders' predictions were wrong and LIBOR moved in an unfavorable direction, the traders and the financial institutions stood to lose money to their counterparties.

14. Because traders often took large derivative positions, even small moves in the LIBOR fix could result in large swings in profits or losses from trades.

15. In addition to being used to price derivative products, financial institutions and other lenders in the United States and elsewhere frequently used LIBOR to set their own reference interest rates for financial instruments and consumer lending products, which included mortgages, credit cards, and student loans, among others.

16. A contributor panel bank's submission was to be an independent estimate of that bank's borrowing costs, and not

altered to reflect trading positions that stood to gain or lose based on LIBOR rates.

17. Because LIBOR was calculated as an average of banks' submissions, if a bank coordinated its submission with another contributor panel bank, it could affect the fix more significantly than if it manipulated only its own submission.

18. At various times relevant to this complaint, the Yen LIBOR contributor panel included, among others, the following institutions: a) Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), a financial institution and global financial services company headquartered in Utrecht, the Netherlands with an FDIC insured branch located in the United States; b) Bank-A, headquartered in the United Kingdom; and c) UBS AG ("UBS"), headquartered in Switzerland.

## The Individuals and the Entities

19. From at least in or about January 2006 through at least in or about November 2008, defendant PAUL ROBSON worked as a Senior Trader at Rabobank's Money Markets and Short Term Forwards desk in London. From in or about January 2006 until at least in or about November 2008, he served as Rabobank's primary submitter of Yen LIBOR to the BBA and traded in derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of ROBSON's trading positions depended on the direction in which Yen LIBORs moved. Starting in about 2009, ROBSON worked at a brokerage firm in the United Kingdom and thereafter moved to a London-based office of a Japanese bank.

20. From at least in or about June 2006 through at least in or about October 2008, defendant PAUL THOMPSON was Rabobank's Head of Money Market and Derivatives Trading for Northeast Asia. In or about October 2008, he was promoted to Executive Director of local currency trading for Asia, and from in or about November 2010 to at least in or about January 2011 he was a Managing Director and head of liquidity and finance for Rabobank Asia. At times during that period, THOMPSON traded derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of THOMPSON's trading positions depended on the direction in which Yen LIBORs moved.

21. From at least in or about May 2006 through at least in or about late 2010, defendant TETSUYA MOTOMURA was a

Senior Trader at Rabobank's Tokyo desk. During that time, MOTOMURA supervised money market and derivative traders employed at Rabobank's Tokyo desk, including, at times, Trader-R. MOTOMURA traded derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of MOTOMURA's trading positions depended on the direction in which Yen LIBORs moved.

22. From at least in or about May 2006 through in or about September 2010, Trader-R was a Senior Trader for Rabobank's money market unit in Tokyo, Japan and elsewhere in Asia. Trader-R traded derivative products that referenced Yen LIBOR. Because these trades were settled based on the published Yen LIBOR, the profitability of Trader-R's trading positions depended on the direction in which Yen LIBORs moved.

23. Submitter-A worked for Bank-A as a trader from at least in or about May 2006 to at least in or about October 2008. At times while employed at Bank-A, Submitter-A was responsible for making the bank's Yen LIBOR submission.

24. Tom Hayes worked at UBS as a trader from at least in or about July 2006 to at least in or about September 2009 and at the Tokyo office of a New York based financial institution from at least in or about December 2009 to in or about September 2010.[1]

**The Scheme**

25. From at least in or about May 2006 through at least in or about early 2011, PAUL ROBSON, PAUL THOMPSON, and TETSUYA MOTOMURA, the defendants, together with Trader-R, and others, intending to manipulate and attempt to manipulate the interest rates referenced by derivative products throughout the financial industry to their advantage, engaged in a scheme to obtain money and property by making false and fraudulent Yen LIBOR submissions to the BBA for inclusion in the calculation of Yen LIBOR.

26. Unless otherwise specifically stated, I have learned the following based on: my review of business records from Rabobank, Bank-A, other Yen LIBOR contributor panel banks, and brokers; my participation in interviews; my review of memoranda of interviews conducted by other agents; my review of summaries prepared by others, including summaries of Rabobank

---

[1] Hayes and another UBS employee were charged in a complaint in the Southern District of New York on December 12, 2012 (12 MAG 3229).

and other banks' trading records; and my review of publicly available information:

    a. From at least May 2006 through at least November 2008, ROBSON was responsible for making Rabobank's Yen LIBOR submissions to the BBA.

    b. THOMPSON, MOTOMURA, ROBSON, and Trader-R all traded products that referenced Yen LIBOR. The profitability of their trading positions was dependent on the fixing of the Yen LIBOR rates.

Manipulation of Rabobank's Yen LIBOR Submissions

    c. ROBSON made and caused to be made false and fraudulent Yen LIBOR submissions to benefit his own trading positions and at the request of Rabobank traders THOMPSON, MOTOMURA, and Trader-R. At various times relevant to this complaint, ROBSON submitted rates at a specific level requested by his co-defendants and Trader-R.

    d. ROBSON, THOMPSON and MOTOMURA knew and foresaw that Thomson Reuters would publish the rates submitted by Rabobank and the other panel banks and the averaged rates, or LIBORs. Thomson Reuters, the BBA's agent, published the Yen LIBOR rate by sending a wire communication from the United Kingdom to New York, New York. ROBSON, THOMPSON, and MOTOMURA knew and foresaw that Rabobank traded derivatives with counterparties in New York, New York and that the Yen LIBOR rates that they manipulated would be published to those counterparties in this manner.

    e. ROBSON made Yen LIBOR submissions in an upward or downward direction consistent with his own trading interests and his co-conspirators' requests. For example:

        i. In an email on May 19, 2006,[2] THOMPSON requested ROBSON "sneak your 3m libor down a cheeky 1 or 2 bp" because "it will make a bit of diff for me." ROBSON responded: "No prob mate I mark it

---

[2] The documents referenced herein are attached as exhibits, as listed in Appendix A.

9

                    low."[3] ROBSON then caused Rabobank to submit a 3-month Yen LIBOR at 0.17 percent. The submission that ROBSON caused to be sumitted was four basis points lower than Rabobank's submission the day before and moved Rabobank's submission from the panel's second highest to tied for the lowest.[4]

      ii.     In an email on July 24, 2008, Trader-R asked ROBSON, "Could you set 6m at 0.97% please? Moto [MOTOMURA] has big fixings over the next couple of weeks so that it would be nice if you could keep it as low as possible for some time." ROBSON affirmed, "Will do mate." ROBSON then caused Rabobank to make a 6-month Yen LIBOR submission of 0.97 percent, which was tied for the second lowest submission that day and was three basis points below Rabobank's submission the day before. Rabobank's submission for 6-month Yen LIBOR remained at 0.97 percent – the second lowest – through July 30, 2008.

      iii.    In a phone call on October 30, 2007, ROBSON asked MOTOMURA, "do you want me to set anything for you?" On that same date, Motomura replied, "if it is lower, it's better for me" and asked for "low 6's please." ROBSON caused Rabobank to submit a 6-month Yen LIBOR at 0.98 percent, three basis points lower than Rabobank's submission the day before, moving Rabobank's submission from the middle of the panel to the panel's second lowest.

---

[3] This quotation and those that follow (unless indicated as translations) are verbatim and include spelling and grammatical errors contained in the original communications.

[4] As used in this communication and those that follow, the letter "m" is an abbreviation for month and the preceding number signifies the tenor. Thus, in this instance "3m" represents a three month borrowing period (or "tenor"). The letters "bp" are an abbreviation for basis points as defined above in paragraph 10.

10

    f.    THOMPSON, MOTOMURA, and Trader-R's requests to ROBSON were made to benefit their trading positions, a fact they expressly acknowledged on repeated occasions. For example:

        i.    On November 8, 2006, THOMPSON wrote in an email to ROBSON, "Got a few big 3mth fixings in next two days, any chance you cud bump it up a couple? What do u actually think 3mth today is 45.25 – 45.5 ish?" ROBSON responded, "will set them high and dry skip." ROBSON caused Rabobank to submit a 3-month Yen LIBOR of 0.46 percent, which was three basis points higher than its previous submission on November 7, 2006, moving it from tied for the panel's second lowest to tied for the panel's third highest. The following day, THOMPSON responded, "thx skip… 1 more today… 3mths." Rabobank again submitted its 3-month Yen LIBOR at 0.46 percent, keeping Rabobank's submission tied for the panel's third highest.

        ii.    In an email on September 21, 2007, Trader-R informed ROBSON: "I have some fixings in 1mth so would appreciate if you can put it higher mate." That day, Robson caused Rabobank to submit a 1-month Yen LIBOR of 0.90 percent, which was seven basis points higher than the previous day, moving Rabobank's submission from the middle of the panel to the panel's highest.

        iii.    On August 4, 2008, in a Bloomberg chat, MOTOMURA asked ROBSON, "Please set today's 6mth LIBOR at 0.96  I have chunky fixing." ROBSON responded, "no worries mate." That day, Robson caused Rabobank to submit a 6-month Yen LIBOR of 0.96 percent, which was three basis points lower than the previous day, moving Rabobank's submission from tied

11

                 for the panel's fourth lowest to the second lowest.[5]

    g.    In submitting Rabobank's Yen LIBOR, ROBSON considered his own positions as well as the positions of the co-defendants and Trader-R.

        i.    For example, in an email on March 26, 2007, THOMPSON requested, "On libors, this week have a fair bit of 6mths rolling off, I am short so if you can discreetly drop your 6m by 1-2 bp without any trouble would be great – if not no probs mate." ROBSON responded, "sure no prob – all my stuff is mainly 1 mth so will keep that high and drop 6's cheers." Over the course of that week, ROBSON caused Rabobank to make 6-month Yen LIBOR submissions that dropped four basis points and went from being tied for second highest on the panel to being tied for lowest on the panel. Rabobank's 1-month Yen LIBOR submission on March 26, 2007, which ROBSON also caused, stayed at the same level as the previous day and was tied for the second highest of all panel banks.

    h.    The defendants separately acknowledged that they communicated with each other and took trading positions into consideration when making Rabobank's Yen LIBOR submissions. For example:

        i.    On December 18, 2006, after Trader-R informed THOMPSON that he needed "high 1s," THOMPSON responded that he would tell the person he believed to be submitting rates that day "to put a high 1s for you." THOMPSON further clarified that he would inform the backup submitter, "for choice put it higher rather than lower," explaining "I don't like to tell them [the person

---

[5] Bloomberg Chat is a service provided by Bloomberg LP that permits participants to communicate electronically. Bloomberg LP maintains servers utilized in these services in New York New York.

12

        whom THOMPSON believed would make the submission] in too black and white but Pookie [ROBSON] always understands."[6]

  ii.    On July 25, 2008, in a phone call recorded and provided by Rabobank, MOTOMURA was asked by a trader at another bank about Rabobank's Yen LIBOR submissions. He admitted that Rabobank's recent 0.97 percent LIBOR submission had been set "due to [his] wishes" explaining that "it was obviously… a little bad… but the person with the strongest wishes gets to decide it."[7]

  iii.    On July 8, 2009, in a Bloomberg chat with ROBSON, Trader-R observed, "looks like some ppl are talking with each other when they put libors down... quite surprised that 3m libors came down a lot." To this, ROBSON, who at the time was working at a U.K brokerage firm, responded, "yes deffinate manipulation – always is tho to be honest mate...i always used to ask if anyone needed a favour and vise versa....a little unethical but always helps to have friends in mrkt."

<u>Coordination of Falsified Yen LIBOR Submissions with Other Banks</u>

  i.    In addition to falsifying Rabobank's own Yen LIBOR submissions, at various times relevant to this complaint, ROBSON coordinated with Submitter-A of Bank-A to make Yen LIBOR submissions that mutually benefitted both Rabobank's and Bank-A's trading positions.

    i.    For example, in an email on March 22, 2007, Submitter-A explained the agreement with ROBSON to his colleagues, "we usually try and help each other out...but only if it suits."

---

[6] I know from reading e-mails sent to and received by ROBSON that his nickname was "Pookie."

[7] The conversation occurred in Japanese. The transcription produced herein is a draft translation.

13

j.  ROBSON made and caused to be made false Yen LIBOR submissions to the BBA at the request of Submitter-A.

   i.  For example, in a chat on July 19, 2007, Submitter-A wrote to ROBSON, "mrng beautiful.....if u can would love a low fixing in 3s libor today." ROBSON responded, "ok skip – what u need," to which Submitter-A answered, ".77 if poss but just no higher than yest!!" ROBSON confirmed "no prob." That day, ROBSON caused Rabobank to make a Yen LIBOR submission of 0.77 percent, which was tied for the second lowest panel bank submission and which was unchanged from Rabobank's submission the previous day.

k.  Submitter-A made Yen LIBOR submissions that were consistent with ROBSON's requests.

   i.  For example, in a chat on July 27, 2006, ROBSON wrote to Submitter-A, "morning skip....my little yellow friend in tokyo [Trader-R] wants a high 1m fix from me today....am going to set .37 – just for your info sir." To this, Submitter-A responded, "that suits me mate as got some month end fixings so happy to ablige..rubbery jubbery..:-O" Bank-A submitted a 1-month Yen LIBOR rate of 0.37 percent, two basis points higher than Bank-A's submission the day before, moving its submission from tied for the panel's lowest to tied with Rabobank for the second highest submission. Rabobank also submitted 1-month Yen LIBOR at 0.37 percent.

   ii.  On the following day, ROBSON wrote to Submitter-A, "morning skipper.....will be setting an obscenely high 1m again today...poss 38 just fyi." Submitter-A responded, "(K)...oh dear..my poor

14

       customers.... hehehe!! manual input libors again today then!!!!" On July 28, 2006, Bank-A and Rabobank both submitted 1-month Yen LIBOR rates of 0.38 percent, which tied them for the second highest submission that day on the panel. ROBSON caused Rabobank to submit this Yen LIBOR rate.

 l. ROBSON also helped Tom Hayes manipulate YEN LIBOR to increase his influence in the market.

   i. For example, on July 18, 2008, in an exchange regarding setting the 1-month Yen LIBOR, a broker located in the United Kingdom asked ROBSON to submit a rate "as low as possible basically," and told ROBSON that it was for "UBS...Tom [Hayes]." After offering to set 0.63 percent, ROBSON said "Make sure he [Hayes] knows… you know scratch my back." On July 18, 2008, ROBSON caused Rabobank to submit a 1-month Yen LIBOR rate of 0.63 percent, which was eight basis points lower than the previous day, moving Rabobank's submission from tied for the highest to tied for the second lowest.

 m. Even after ROBSON left Rabobank, he continued to communicate with Trader-R and manipulate Yen LIBOR with his co-conspirators.

   i. In a Bloomberg chat on May 15, 2009, Trader-R asked ROBSON, who had left Rabobank for a brokerage firm, "How about 6m yen libor for today?" ROBSON responded, "well strange one...guys think the same 72..problem is UBS wants a high one today so he will call his friends to get it higher if he can...but 72 it shud be again" Trader-R wrote back, "i anyway want it to be hight so,, fine with me  cheers." ROBSON responded, "ok fair enough - will see what we can do for you mate !"

15

False or Fraudulent Submissions Harmed New York Counterparties

    n.    The defendants and Trader-R were aware that by influencing Rabobank's submissions to take into account their trading positions, they were causing Rabobank to make false or fraudulent Yen LIBOR submissions to the BBA.  For example:

        i.    On May 10, 2006, in a chat, ROBSON explained to Submitter-A at Bank-A that, "for info i've been asked by my singapore man [THOMPSON] to help him out with a silly low 6m fixing today."[8] That day, Rabobank's 6-month Yen LIBOR submission was 0.26 percent, which was one basis point lower than the previous day, moving Rabobank's submission from the panel's second highest to tied for second lowest, while the other panel banks' submissions increased by an average of seven basis points.

        ii.    For this and other submissions, ROBSON and THOMPSON knew and foresaw that the Yen LIBOR rate that they manipulated on this day and others would be published in New York, New York through the transmission of a wire communication that traveled in interstate and foreign commerce.

        iii.    Later that same day, in a discussion with Trader-R about other banks' Yen LIBOR submissions, ROBSON admitted, "it must be pretty embarrassing to set such a low libor (I was very embarrassed to sey my 6 mth – but wanted to help thomo [THOMPSON]).tomorrow it will be more like 33 from me."

        iv.    On the following day, THOMPSON thanked ROBSON, "for yest" and indicated that he needed "6 mth libor" low again. ROBSON responded, "6m sets at 31 today mate…will put in something rediculously

---

[8] At that time, THOMPSON was working for Rabobank in Singapore.

16

    low again tho – no probs." ROBSON caused Rabobank to submit a 6-month Yen LIBOR of 0.28 percent. As a result, Rabobank's submission that day remained the second lowest of all panel banks.

  v. In an email on September 21, 2007, Trader-R wrote to ROBSON asking: "wehre do you think today's libors are? If you can I would like 1mth libors higher today." ROBSON responded, "bookies reckon .85." Trader-R informed ROBSON, "I have some fixings in 1mth so would appreciate if you can put it higher mate." ROBSON answered, "no prob mate, let me know your level," to which Trader-R requested, "Wud be nice if you could put 0.90% for 1mth cheers." ROBSON confirmed, "sure no prob I'll probably get a few phone calls but no worries mate." Trader-R replied, "If you may get a few phone calls then put 0.88% then. Cheers." ROBSON answered, "dont worry mate- there's bigger crooks in the market than us guys!" On September 21, 2007, ROBSON caused Rabobank to submit a 1-month Yen LIBOR rate of 0.90 percent, which was seven basis points higher than the previous day, moving Rabobank's submission from the middle of the panel to the panel's highest.

o. Based on previously-identified sources, I have learned that Rabobank traded in derivative products tied to Yen LIBOR with counterparties based in New York, New York.

  i. On March 19, 2008, MOTOMURA asked Trader-R to make the rate as high as possible. Trader-R then wrote to ROBSON in an email, "We have loads of 6mth fixings today. If possible, could you set 6m libor to 1.10% please? We don't have particular interest in other libors." ROBSON wrote back, "sry just to confirm 6m you want at 1.10??? Ok

17

will do that but I will prob get a phone call at I set 02 yesterday and brokers reckon everything a little lower today… indications are… 1m 85 2m 91 3m 975 6m 1.03." After learning that ROBSON expected the 6-month rate to be 1.03, Trader-R responded, "actually,,, moto man [MOTOMURA] would like 6m to be higher today..... If it is not appropriate, it is fine mate, I will explain the situation to him." ROBSON responded, "Well its no prob mate – I can set it that high….It will be quite funny to see the reaction!" That day, ROBSON caused RABOBANK to submit a 6-month Yen LIBOR of 1.10 percent, which was eight basis points higher than Rabobank's submission the day before, moving its submission from the middle of the panel to the panel's second highest.

ii. Rabobank had previously entered into a swap contract with a financial institution which was a federally-chartered financial institution within the definition of 18 U.S.C. § 20. The profitability of that transaction was directly affected by the Yen LIBOR rate on March 19, 2008. On March 20, 2008, as a result of the March 19, 2008 conversation described above, ROBSON, MOTOMURA, and Trader-R caused one such payment to be transmitted via international wire transfer from Rabobank's offices in Utrecht, Netherlands to a counterparty in New York, New York.

WHEREFORE, deponent prays that arrest warrants be issued for the above-named defendants and that they be imprisoned or bailed as the case may be.

_____
JEFFREY WEEKS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

JAN 1 3 2014

Sworn to before me this
___13th___ day of January, 2014

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

RONALD L. ELLIS
United States Magistrate Judge
Southern District of New York